# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                                 Case No. 16-CR-168

GREGORY TIRADO JR., et al.,

    Defendants.

## ORDER AND REPORT AND RECOMMENDATION
## ON DEFENDANTS' PRETRIAL MOTIONS

Motions to Suppress……………………………………………………….. 2

    Wiretap Intercepts……………………………………………….…….. 2

    Pole Camera Footage……………………………………............ 18

    Evidence from Jose Perez's Residence…………………..……….. 29

    Evidence from Defendant Dumas' Cell Phones……………….….. 29

Motion to Sever………………………………………………………… 35

Motions to Disclose Confidential Informants…………………………. 38

Motion for Bill of Particulars (Count One) ………………….……….. 42

Motion to Dismiss (Count Two) or For Bill of Particulars................... 44

Motion for Notice of Certain Evidence……………………............. 49

On October 18, 2016, a grand jury returned a seventeen-count indictment charging twenty-four defendants with various drug trafficking, money laundering, and firearm offenses, including conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1)(A), and § 846. Defendants have pled not guilty. Due to the number of defendants, number of counts, and the volume of discovery, the case was designated complex. A jury trial before the Honorable Lynn Adelman is adjourned pending resolution of pretrial motions.

Briefing on all pretrial motions closed on January 12, 2018. Now before me are defendants' pre-trial motions: (1) Motions to Suppress Wiretap Intercepts; (2) Motions to Suppress Pole Camera Footage; (3) Motion to Suppress Evidence from Jose Perez's Residence; (4) Motion to Suppress Evidence from Defendant Trevian Dumas' Cell Phones; (5) Motion to Sever; (6) Motions to Disclose Confidential Informants; (7) Motion for Bill of Particulars As To Count One; (8) Motion to Dismiss Count Two, or in the Alternative for A Bill of Particulars; and (9) Motion for Notice of Certain Evidence. I will address each in turn.

1.      *Motions to Suppress Wiretap Intercepts*

On August 26, 2016, a Title III order was signed and issued by the Honorable J.P Stadtmueller. On September 23, 2016, the Honorable Lynn Adelman issued a second continuing Title III order. Both wiretaps were issued to intercept communications to and from telephone number (262) 308-0947 and were ordered to last no longer than thirty days each. Both intercept applications were based on sworn affidavits of FBI Task Force Officer David Rybarik.

2

Defendants argue that the evidence derived from the Title III intercepts should be suppressed because the government failed to show necessity pursuant to 18 U.S.C. § 2518. Defendants Ernesto Perez, Trevian Dumas, Gregory Tirado Jr., and Juan Guajardo assert that Rybarik's affidavit contained material omissions and false statements and request a *Franks* hearing. Additionally, Perez, Dumas, Sorenson, and Tirado Jr. claim that the wiretap orders violated procedures for "roving intercepts" pursuant to § 2518(11).

### 1.1    Request for *Franks* Hearing

Defendants Ernesto Perez, Trevian Dumas, Gregory Tirado Jr., and Juan Guajardo argue that the affidavit in support of the Title III wiretap contains false statements and material omissions regarding the government's informants and request an evidentiary hearing pursuant to *Franks  v. Delaware*, 438 U.S. 154 (1978). The government opposes the requests for a *Franks* hearing.

The defendants are entitled to a *Franks* evidentiary hearing regarding the truthfulness of information contained in the warrant application if they can make a substantial preliminary showing that: "(1) the affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause." *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016); *United States v. Johnson*, 580 F.3d 666, 670 (7th Cir. 2009). The same standard is applied to an allegation of material omissions in a warrant application. *United States v. Glover*, 755 F.3d 811, 820 (7th Cir. 2014).

### 1.1.1 Statements Regarding Use, Access, and Success of Cooperators

Defendants contest the truthfulness of several of Rybarik's statements in his affidavit. First, defendants argue that the statements "it is too risky to employ long-term sources" (Rybarik Aff. ¶ 171) and "several sources have limited utility because they have limited access to the violators," (Rybarik Aff. ¶ 175), are false and contain material omissions. (Perez Mot. to Suppress at 16, Docket # 315). As to risk in using the confidential sources, defendants assert that cooperating source CS-2 was in fact used until defendants were arrested on October 6, 2016. (*Id.*) Defendants also argue that the government omitted "the extent to which the cooperating sources could have been successfully used to infiltrate this conspiratorial group." (*Id.*)

As to the cooperating sources' limited access, defendants note that the cooperating sources had access to the "Violators" as well as the main suppliers and Maniac Latin Disciple (or "MLD") leaders. (*Id.* at 18-19.) Specifically, defendants point out that paragraph 33 of the affidavit states that informant CS-2 "was close to both Gregory Tirado Jr. and Gregory Tirado Sr." and paragraph 15 of the affidavit states that "CS-1 was 'fronted' [drugs] from the 'top cocaine suppliers in this investigation.'" (*Id.* at 19.)

Defendants have failed to make a substantial preliminary showing of falsity or material omission regarding these statements. Specifically, the statements concerning the risk of employing long term cooperating sources were substantiated by the affidavit. (*See* Rybarik Aff. ¶ 171.) For example, CS-2, a member of MLD for ten years, was threatened by Tirado Sr. (Rybarik Aff. ¶ 33; ¶ 174.) Additionally, CS-1 was asked whether he was cooperating with law enforcement. (Rybarik Aff. ¶ 173.) Further, as discussed below, MLD

4

leaders were suspected to have committed violence against MLD members out of fear of them cooperating with law enforcement. (Rybarik Aff. ¶ 172.)

Similarly, defendants have not shown that the affidavit's statement regarding the limited access of the cooperators is false. The affidavit asserts and defendants do not contest, that at the time of the application, no cooperating sources had access to Jose Perez and Isaac Vasquez, both whom were suspected drug suppliers. (Rybarik Aff. ¶ 196.) Finally, defendants have not shown that the affidavit omitted information about the cooperators' success. Unlike the affidavit in *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001)—a Ninth Circuit case that defendants cite—the affidavit in this case demonstrates the extent of the cooperating sources' success. For example, the affidavit explains that CS-1: (1) was a long standing member of the MLD (Rybarik Aff. ¶ 15); (2) identified high ranking MLD leaders (Rybarik Aff. ¶ 25); and (3) was fronted large quantities of cocaine and marijuana (Rybarik Aff. ¶ 30). However, this does not negate the cooperating sources' limited access to all of the MLD drug suppliers. For all these reasons, defendants have not made a preliminary showing that the affidavits contained false statements or omissions regarding the use, access, and success of the cooperators warranting a *Franks* hearing.

### 1.1.2   Statement Regarding Murder of MLD Member

Next, defendants challenge the veracity of the statements in paragraph 172 of the affidavit. (Docket # 315 at 17.) Paragraph 172 of Rybarik's affidavit reads as follows:

> The Zion and Waukegan Police Department (or "ZWPD") has information that suspected cooperators against the MLD street gang have been killed. For example, in 2009 or 2010, two MLD gang members followed orders and killed a rival Latin King gang member, as instructed by MLD leaders. The MLD leaders were concerned that two MLD gang members would cooperate with law enforcement and disclose the ordered killing as well as identify the other MLD gang members involved in the killing. The MLD gang eventually killed the two members who committed

5

the murder of the rival Latin King gang member, due to concerns that the MLD who committed the murder would provide details to implicate MLD Gang leaders in the murder of the Latin King.

(Rybarik Aff. ¶ 172.)

Defendants argue that this paragraph contains several false statements and material omissions. First, defendants argue that there is no evidence that the killing of the one (not two) MLD member was ordered by an MLD leader. (Docket # 315 at 18.) Next, defendants assert that the information about MLD leaders ordering the murder of MLD gang members came from a jailhouse informant; an inherently unreliable source. (*Id.*)

Defendants also have not met their burden as to this allegation. A demonstration that an affidavit contains inaccurate information is insufficient. Rather, the defendants must also demonstrate that the affiant knew, or should have known, that the statement was false. In this regard, the focus is on the state of mind of the affiant. *United States v. Jones*, 208 F.3d 603, 607 (7th Cir. 2000). The defendants must offer direct evidence of the affiant's state of mind or inferential evidence to prove deliberate falsehood or reckless disregard for the truth. *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001) (citing *United States v. Williams*, 737 F.2d 594 (7th Cir. 1984)) (internal quotation marks omitted). This is a difficult burden for a defendant to meet. *See United States v. Swanson*, 210 F.3d 788, 789-90 (7th Cir. 2000).

In this case, even assuming that the Zion and Waukegan Police Department relayed false information to Rybarik about the details of the MLD gang member murders, defendants have not shown that Rybarik knew the statements were false or included the statements in reckless disregard of the truth. *See United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994) ("A *Franks* violation occurs only if the affiant knew the party was lying, or if the affiant proceeded in reckless disregard of the truth.").

6

Additionally, the defendants do not make a substantial preliminary showing that the officers who were passing the information to Rybarik knew or should have known that the information being relayed was false. The state of mind not only of the affiant, but also of the officers from whom the affiant received false information incorporated into the affidavit, is at issue. *See United States v. Pritchard*, 745 F.2d 1112, 1118 (7th Cir. 1984); *United States v. McAllister*, 18 F.3d 1412, 1417 (7th Cir. 1994). Thus, defendants fail to make a substantial preliminary showing on the second of the *Franks* requirements—that the affiant made the false statement knowingly and intentionally, or with reckless disregard of the truth. Accordingly, I need not reach the final *Franks* hearing element which requires the defendants to show that the false statements were material to probable cause.

### 1.1.3   Statements About Search of CS-2 and Threat to CS-2

Third, defendants assert that the affidavit contained several false statements or material omissions regarding a May 31, 2016 controlled buy from Tirado Sr. The defendants argue that the statement about CS-2 being afraid of being "strip-searched" was false as Ortiz-Cartajena merely "touched [his] body to feel for a wire." (Docket # 315 at 19.) The defendants have not have shown that this statement was false. The affidavit alleges that CS-2 feared he was going to be strip searched; he did not allege that he was in fact strip searched. This statement does not warrant a *Franks* hearing.

Additionally, as to the May 31, 2016 controlled buy, defendants allege that paragraph 112 contains material omissions. Paragraph 112 reads as follows:

> It should be noted that while reviewing the recorded footage, TFOs found that during this buy operation when CS-2 arrived and walked to the backyard, CS-2 greeted Tirado Sr. Tirado Sr. then told CS-2 that if CS-2 was telling on him, that he would kill CS-2 when he got out of prison. Tirado Sr. told CS-2, "I'm not joking with you motherfucker."

7

(Rybarik Aff. ¶ 112.) This incident is cross referenced with paragraph 174 of the necessity section of the affidavit which reads as follows:

> As another example, on April 31, 2016, while wearing recording equipment, CS-2 was brought to . . . Tirado Sr.'s basement . . . and searched by Pedro Juarez and Marcelino Ortiz-Carajena, associates of Tirado Sr. Prior to entering the basement, Tirado Sr. informed CS-2 that if CS-2 is found to be working with law enforcement and Tirado Sr. is arrested/incarcerated due to CS-2, every day that Tirado Sr. is in prison Tirado Sr. will be thinking about killing CS-2. Upon being let out of prison, Tirado Sr. will kill CS-2.

(Rybarik Aff. ¶ 174.)

Defendants assert that the officer intentionally omitted Tirado Sr. saying "I'm just playing" at the end of his threat. (Docket # 315 at 19.) Defendants allege that review of the recording of the controlled buy shows that CS-2 knew that Tirado Sr. was joking when he made the statement. Here, even if Rybarik omitted "I'm just playing," defendants have not made a preliminary showing that the inclusion of this statement would have altered the necessity of the wiretap intercept. This is especially true, in light of the surrounding circumstances of this incident which indicated intimidation of the cooperator. The cooperator was brought down to a dark basement and patted down by two individuals. (Rybarik Aff. ¶ 174.)

Finally, defendants assert that the statement in paragraph 174 about Tirado Sr. thinking of killing CS-2 every day he is prison was never said. (Docket # 315 at 19-20.) The government counters that Tirado Sr. did threaten to kill CS-2 when he got out of prison. (Gov't Resp. at 25, Docket # 359.) Even if this statement was not made as defendants argue, defendants have not made a preliminary showing that this threat alone was material to the necessity of the wiretap intercept. As will be discussed further below, Rybarik submitted an extensive factual presentation on the necessity of the wiretap intercept order.

Given the totality of the information in the affidavit, the defendants have not made a substantial preliminary showing on any of their claims of falsity or material omissions warranting a *Franks* hearing. Defendants' request for a *Franks* hearing is, therefore, denied.

### 1.2    Necessity

Defendants argue that the affidavit fails to demonstrate the requisite need for the intercept order. First, they argue that the government was successful in infiltrating the conspiracy group. Next, they argue that other investigatory procedures were either successful or would have been successful if the government attempted or continued to pursue them. (Docket # 315 at 5-21.) Third, they assert that Rybarik's affidavit contains "boilerplate conclusions" which simply "describe the investigative limitations inherent in most narcotic investigations." (*Id*. at 7.)

Title 18 U.S.C. § 2518(1)(c) requires that an application for an electronic intercept contain:

> [A] full and complete statement as to whether or not investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

§ 2518(1)(c). The government needs to establish only one of the three alternatives listed in the statute. *United States v. Mandell*, 833 F.3d 816, 821 (7th Cir. 2016). Additionally, "[t]he necessity requirement 'was not intended to ensure that wiretaps are used only as a last resort in an investigation, but rather that they are not to be routinely employed as the initial step in a criminal investigation.'" *Id.* (quoting *United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006)). "[T]he government's burden in establishing compliance with § 2518(1)(c) 'is not great' and the requirement of exhausting 'other investigatory procedures' prior to obtaining a wiretap is 'reviewed in a practical and common-sense fashion.'" *McLee*, 436 F.3d at 763

9

(internal citations omitted). Furthermore, the government is not required to show that prosecution would be impossible without the wiretap or even that the evidence "sufficient for indictment could not conceivably be obtained by other means." *Id.* (quoting *United States v. Plescia*, 48 F.3d 428, 430 (7th Cir. 1995)). Finally, a court reviewing the necessity of a wiretap applies an abuse of discretion standard, "giving substantial deference to the determination of the issuing judge." *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988).

With these principles in mind, I find that the affidavit filed in support of the application satisfied the necessity requirement. Paragraphs 169 through 219 of Rybarik's affidavit submitted to Judge Stadtmueller on August 26, 2016 set forth why conventional investigative techniques "(1) [had] been attempted and have not been fully successful; (2) reasonably appear to be unlikely to be productive if attempted; or (3) are too risky to employ under the circumstances surrounding this investigation." (Rybarik Aff. ¶¶ 169-219.) Paragraphs 146 through 177 of Rybarik's second affidavit submitted to Judge Adelman on September 23, 2016 make the same assertions. (Rybarik Second Aff. ¶¶ 146-177.) Specifically, the affidavit stated that the wiretap interception was needed in order to identify: the methods of drug distribution; the roles of accomplices and co-conspirators; the distribution of money involved in the activities; the location of records related to the illegal activities including financial records; the resources used to finance the illegal activities; the disposition of proceeds; the location of narcotics and firearms; and the methods and means used to protect and promote the illegal activities. (Rybarik Aff. ¶ 169.)

As to the risks associated with the continued use of cooperating sources, paragraph 172 of the affidavit asserts that:

> The Zion and Waukegan Police Department (hereinafter "ZWPD") has information that suspected cooperators against the MLD street gang have been killed. For example, in 2009 or 2010, two MLD gang members followed orders and killed a rival Latin King gang member, as instructed by MLD leaders. The MLD leaders were concerned that two MLD gang members would cooperate with law enforcement and disclose the ordered killing as well as identify the other MLD gang members involved in the killing. The MLD gang eventually killed the two members who committed the murder of the rival Latin King gang member, due to concerns that the MLD who committed the murder would provide details to implicate MLD Gang leaders in the murder of the Latin King.

(Rybarik Aff. ¶ 172.)

Further, the affidavit asserts that: "CS-1 observed Trevian Dumas park near [defendant] Balderas' residence and asked CS-1 if CS-1 was cooperating with law enforcement, which CS-1 denied." (Rybarik Aff. ¶ 173.) The affidavit also states that CS-1 was informed by gang member Dumas that "CS-1 was believed to be cooperating with law enforcement." Further, "CS-1 no longer wears recording equipment or participates in controlled buys with the [defendants.]" (Rybarik Aff. ¶ 176.)

Later, the affiant avers that:

> As another example, on April 31, 2016, while wearing recording equipment, CS-2 was brought to . . . Tirado Sr.'s basement . . . and searched by Pedro Juarez and Marcelino Ortiz-Carajena, associates of Tirado Sr. Prior to entering the basement, Tirado Sr. informed CS-2 that if CS-2 is found to be working with law enforcement and Tirado Sr. is arrested/incarcerated due to CS-2, every day that Tirado Sr. is in prison Tirado Sr. will be thinking about killing CS-2. Upon being let out of prison, Tirado Sr. will kill CS-2.

(Rybarik Aff. ¶ 174.) In explaining the limited usefulness of physical surveillance the affidavit states:

> The MLD as a group are very surveillance conscious and warn each other of the presence of law enforcement. As discussed above, during the controlled buy on June 1, 2016, Melendez switched the original meet location in the attempt to identify law enforcement. As a result, it is extremely difficult to conduct surveillance without being compromised.

11

(Rybarik Aff. ¶ 182.)

The affidavit states that video surveillance is useful because it allows law enforcement to observe a limited area without the need to be physically present, but is limited because it is not mobile and the drug transactions between Tirado Jr. and the cooperating sources take place indoors. (Rybarik Aff. ¶ 185.) Further, the affidavit explained that tracking devices are of limited use because Tirado Jr. was on house arrest, (Rybarik Aff. ¶ 186) and while a tracking device may be able to record travel of the defendants, it could not determine the purpose and content of different meetings between the Violators. (Rybarik Aff. ¶ 188).

In explaining the limited use of pen register and trap and trace devices, the affidavit states that "[t]elephone analysis, on its own . . . will not reveal detailed information concerning the commission of the Subject Offenses. Nor does such evidence specify the nature, roles, position, or participation of the callers within the conspiracy." (Rybarik Aff. ¶ 190.) Specifically, the affidavit recalls that during a controlled buy with Tirado Sr. on June 24, 2016, telephone records showed that he was in contact with defendants Tirado Jr., Perez, and Melendez, "[b]ut the toll information, without more, does not reveal additional information regarding which additional conspirators, if any, were involved in the controlled buy." (Rybarik Aff. ¶ 191.)

Next, the affidavit stated that using an undercover agent would be unsuccessful because there were no available agents to infiltrate the MLD gang. (Rybarik Aff. ¶ 193.) It further asserted that even if there was an agent available, he would be subjected to physical harm in order to be "jumped" into the gang. (*Id*.) Furthermore, the affidavit states that it

12

"would take an unreasonably long period of time for such an individual to gain the trust of the subjects and otherwise satisfy the goals of the investigation." (*Id.*)

Moreover, in considering the use of search and consent warrants, the affidavit stated that:

> I believe that search warrants executed at this time would likely compromise the investigation by alerting the Violators to the investigation and allowing other identified subjects of the investigation to insulate themselves from detection. For example, law enforcement has not yet identified all of Tirado Jr.'s sources of supply for marijuana and cocaine.

(Rybarik Aff. ¶ 195.)

Later, in describing the limited usefulness of a previously executed search warrant, the affidavit stated that:

> One purpose of this investigation is to show and prove the entire scope of the drug organization and the depth of the sources of controlled substances sustained by the MLD. Although the findings of the warrant conducted on March 15, 2016, at 2101 Fairview Terrace supported the investigation of the MLD and Tirado Jr. and Tirado Jr.'s associates as to drug trafficking, the search, on its own, could not support [an] indictment for the Subject Offenses.

(Rybarik Aff. ¶ 201.)

Further, the affidavit asserted that even though a failed "trash pull" was attempted at Tirado Jr.'s residence, "trash searches are unlikely to produce evidence revealing the full nature and scope of the MLD criminal activities." (Rybarik Aff. ¶ 202.) Rybarik also asserted that subpoenaing the Violators before a grand jury would be unsuccessful because "they would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify." (Rybarik Aff. ¶ 205.)

Finally, Rybarik stated that a financial investigation had been unsuccessful. (Rybarik Aff. ¶ 209.) For example, the government was unable to identify defendant Munoz's source of income despite his account at Chase Bank showing deposits totaling $75,052.00 from

13

October 15, 2015 to June 13, 2016. (Rybarik Aff. ¶ 212.) Additionally, several cooperating sources observed defendants Tirado Jr., Vasquez, Perez, and Gallegos engage in narcotics sales for approximately $5,000 to $50,000. (Rybarik Aff. ¶ 210.) When noting that law enforcement had been unable to identify tangible property by defendants, the affidavit asserted that an "[a]nalyis of Wisconsin Department of Transportation records have shown that many vehicles operated by the targeted group are not registered in their names, but in associates', girlfriends', or relatives' names." (*Id.*) Moreover, data from financial reports revealed suspicious activity regarding several defendants' bank accounts. (Rybarik Aff. ¶ 217.)

In the face of the facts averred to in the affidavit, defendants' arguments—that necessity was not shown because of the government's success with cooperating sources—fails. That the government had success with its cooperating sources does not negate the necessity for a wiretap. Even when the government has success using cooperating sources, the Seventh Circuit has upheld a finding of necessity when the continued use of cooperating sources "would not accomplish the goals of the investigation." *United States v. Goodwin*, 496 F.3d 636, 640 (7th Cir. 2007) (upholding a Title III issuance where the informants had initial success, but were unable to identify all of the drug suppliers, distributors, and full operation of the drug conspiracy). Moreover, in this case, the affiant averred to specific safety risks associated with the continued use of the cooperating sources. (Rybarik Aff. ¶¶ 171-174.)

Similarly, defendants' argument that the availability and use of other normal investigative tools negated the necessity of the intercept order also fails. The affidavit averred that the MLD, as a group, were very "surveillance conscious" and even switched

the location of a drug deal in order to avoid law enforcement. (Rybarik Aff. ¶ 182.) Also, the affidavit stated that video surveillance was useful, but insufficient as many drug transactions took place indoors. (Rybarik Aff. ¶ 185.) Further, Rybarik asserted that a tracking device was not useful because Tirado Jr. was on house arrest and confined to his home. (Rybarik Aff. ¶ 188.) Additionally, the affidavit stated that a pen register and trap and trace would not "specify the nature, roles, position, or participation of the callers within the conspiracy." (Rybarik Aff. ¶ 190.)

Moreover, the affidavit explains that using an undercover agent would likely fail because of the close familial nature of the MLD gang. (Rybarik Aff. ¶ 193.) Although a search warrant was executed March 15, 2016 at 2101 Fairview Terrace, the affidavit stated that executing search warrants would not be useful at the present time because "law enforcement has not identified all of Tirado Jr.'s sources of supply for marijuana and cocaine." (Rybarik Aff. ¶ 195.) Further, the affidavit stated that many of the Subject Offenses do not involve evidence being placed in residential trash cans. (Rybarik Aff. ¶ 202.) On this record, the affidavit sufficiently demonstrated the limits of traditional investigative tools.

Again, the government's burden of establishing compliance with § 2518(1)(c) "is not great" and the requirement that the government exhaust "normal investigative procedures" is to be reviewed in a "practical and common sense fashion." *See Zambrana*, 841 F.2d at 1329. Accordingly, given the extensive factual presentation in Rybarik's affidavit regarding the necessity of the wiretap, I do not find that Judge Adelman or Judge Stadtmuller abused their discretion in finding that "normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or be too dangerous." 18 U.S.C. §

2518(3)(c). Therefore, I recommend that the motions to suppress the wiretap intercepts for failure to show necessity be denied.

### 1.3. Roving Intercept Wiretap

Defendants Ernesto Perez, Trevian Dumas, Bradley Sorenson, and Gregory Tirado Jr. argue that both Title III orders authorized "roving intercepts" and failed to satisfy the heightened particularity requirement set forth in § 2518(11)(a) and (b). (Docket # 315 at 21.)

There are two types of wiretap interceptions: the standard wiretap interception and the roving interception. To obtain authorization for the "standard" intercept, the government must show "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." § 2518(1)(b)(ii). Further, the statute states that a court must:

> [Determine] on the basis of the facts submitted by the applicant that . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted, are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

§ 2518(3)(d). The court's order in turn must specify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted." § 2518(4)(b).

On the other hand, roving interceptions allow for the interception of any telephone used by the target without the need to specify the "facilities from which, or the place where the communication is to be intercepted." For this type of intercept, the government must satisfy enhanced authorization standards. § 2518(11). The government must not only identify "the person believed to be committing the offense and whose communications are to be intercepted," but also make "a showing that there is probable cause to believe that the

person's actions could have the effect of thwarting interception from a specified facility." § 2518(11)(b)(ii).

In this case, the wiretap orders authorized the interception of "background conversations intercepted in the vicinity of the target telephone while the telephone is off the hook or otherwise in use." (Gov't Resp. at 27, Docket # 359.) The defendants argue that by authorizing the interception of "background conversations," the interception became essentially a "roving bug" subject to the enhanced authorization requirements. (Docket # 315 at 21.) The government responds that the orders in this case are standard wiretap interceptions of the target telephone and the "background conversation" language did not convert them into roving interceptions. (Gov't Resp. at 27, Docket # 359.)

Neither party cites, and I have not found, any Seventh Circuit cases addressing this issue. However, in *United States v. Olivia*, 705 F.3d 390 (9th Cir. 2012), the defendants made the same argument being made here—that the "background conversation" language authorized a roving intercept. Although the Ninth Circuit acknowledged the archaic language of the application, (the term "off the hook" does not apply to cell phones as it does land line phones), the court rejected the defendants' broad reading of the language as having authorized a roving intercept. *Id*. at 400. Moreover, as the First Circuit recently noted in *United States v, Gordon*, 871 F.3d 35 (1st Cir. 2017), the language at issue in this case is "standard fare in wiretap applications," and "its inclusion does not make the wiretap orders impermissibly broad. After all, describing potential types of communications to be intercepted appears consistent with Title III's directive to define the sought-after communications with particularity." *Id*. at 44.

Accordingly, I find no authority to support that the "background conversation" language converted the orders in this case to orders for roving interceptions. Law enforcement sought to intercept "wire and electronic communications over Target Phone 1" as well as "background conversations in the place where co-conspirators may be calling from or called. . . ." (Rybarik Aff. ¶ 228.) The *Olivia* and *Gordon* courts' reading of that language is more persuasive and reasonable than the broader interpretation advanced by defendants. Because law enforcement sought and received authorization for standard wiretaps, rather than roving intercepts, they were not required to meet the enhanced authorization standard.

For these reasons, I recommend that defendants' motion to suppress evidence from the Title III wiretaps be denied.

### 2. *Motion to Suppress Evidence From Pole Camera Coverage*

Defendants Brian Johnson (Docket # 319), Gregory Tirado Sr., (Docket # 322), Juan Guajardo (Docket # 329), Gregory Tirado Jr. (Docket # 334), Pedro Juarez (Docket # 336), Angel Reyes (Docket # 339), Eric Minkey (Docket # 344), and Marcelino Ortiz-Cartajena[1] (Docket # 436) seek to suppress evidence obtained from pole camera surveillance. Specifically, defendants assert that two surveillance pole cameras, one which recorded activity in front of the duplex at 1954/1956 Prospect Street, Racine, Wisconsin and one that recorded activity in the backyard of the same duplex, constituted a warrantless search in violation of the Fourth Amendment.

---

[1] Cartejena has reached a plea agreement with the government and requests his pretrial motions be withdrawn. (Docket # 450.)

18

2.1    Background Facts

I conducted an evidentiary hearing on this motion where the following witnesses testified: Detective Daniel Langendorf, Gail Geisler, and William Kohl.

*Detective Langendorf*

Detective Langendorf testified that he received information that Gregory Tirado Jr. and others were involved in the selling of cocaine and marijuana in Racine, Wisconsin. (Evid. Hearing at 8:54:35.)[2] During the course of the investigation, Detective Langendorf determined that Gregory Tirado Jr. was residing at 1954 Prospect Street as of late November 2015. (*Id.* at 8:56:24-41.) Detective Langendorf testified that Juan Guajardo resided at 1956 Prospect Street. (*Id.* at 9:15:18.) Langendorf stated that prior to the installation of the pole cameras, he saw Tirado Jr. meet with several coconspirators at 1954 Prospect Street. (*Id.* at 8:56:53.) He explained that 1954 and 1956 Prospect Street (or "the residence") was a side-by-side duplex house. (*Id.* at 9:00:24.) Further, Langendorf stated that Prospect Street and Fairchild Street (the intersecting street) were roads that were accessible to the public. (*Id.* at 8:59:42.) Langendorf explained that the duplex dwelling shared the front area and backyard. (*Id.* at 9:02:25.)

Further, Detective Langendorf testified that the backyard of the residence had four sides. (*Id.* at 9:16:39.) Langendorf also testified that there is an approximately six foot tall fence on the west side of the residence separating the residence from the property located at 2006 Prospect Street. (*Id.* at 10:01:23.) Detective Langendorf testified that a forty-nine inch tall fence was located on the east side of the residence along Fairchild Street. (*Id.* at 9:20:19.) He stated that the garage was located on the north side of the residence. (*Id.* at 9:19:20.)

---

[2] I cite to the audio recording of the hearing.

Detective Langendorf stated that during the summer and fall of 2016, he used investigative techniques such as speaking with confidential informants and conducting controlled buys with individuals believed to be involved with the "Tirado drug trafficking organization." (*Id.* at 9:07:02.) Further, Detective Langendorf testified that he and his fellow officers utilized cameras that were attached to poles to observe Tirado Jr. (*Id.* at 9:07:15.) He stated that one pole camera was placed facing the front of the residence and the other was placed facing the backyard of the residence. (*Id.* at 9:08:16.) He testified that the first pole camera was placed in the rear of the residence on July 15, 2016, (*Id.* at 9:09:35) and the second camera was placed on the pole facing the front of the residence on August 8, 2016. (*Id.* at 9:10:53). He testified that neither camera had infrared capabilities, neither could record audio, and neither was able to view inside the residence. (*Id.* at 9:09:58-9:10:03.) However, both were able to zoom in and out and focus on a particular object. (*Id.* at 9:10:17.) Both cameras ceased monitoring on October 6, 2016. (*Id.* at 9:11:00.) Detective Langendorf testified that he received permission from the utility company to set up the pole cameras. (*Id.* at 9:47:38).

Langendorf testified that while standing on Fairchild Street, he could see the entirety of the backyard of the residence. (*Id.* at 9:32:38.) Finally, Langendorf also testified that he could see more of the backyard while standing on Fairchild Street than he could from the vantage point of the pole camera (*Id.* at 10:16:12.)

*Gail Geisler*

Gail Geisler owns the property of 2006 Prospect Street which is located directly west of the residence. (*Id.* at 10:26:07.) Geisler testified that a fence was located on the property line between 2006 Prospect Street and the residence. (*Id.* at 10:26:40.) She stated that she

20

started to take the fence down in November 2016, (*Id*. at 10:27:00), but did not finish removing the fence until Spring of 2017. (*Id*. at 10:27:09). Geisler further testified that at times, she was able to see into the backyard of the residence from her backyard because of broken parts of the fence. (*Id*. at 10:32:57; 10:44:00.)

*William Kohl*

William Kohl is a private investigator. (*Id*. at 11:05.) He was hired by Juan Guajardo's attorney, Daniel D. Resheter, to take pictures and measurements of the property line between 1954/56 Prospect Street and 2006 Prospect Street. (*Id*. at 11:05:18.) He testified that there were six-foot "fence posts" directly to the left of 1954/1956 Prospect Street. (*Id*. at 11:09:10.) He also testified that there were fence posts that ran parallel to Prospect Street. (*Id*. at 11:09:27.)

### 2.2 Analysis

Pursuant to the Fourth Amendment, defendants move to suppress evidence from the pole camera surveillance of the front and backyard of the residence because the cameras were installed without a warrant. They make three main arguments. First, they argue that there was an expectation of privacy in the backyard because it was fenced in and fell within the curtilage of the home. Second, they argue that the view from the pole camera allowed law enforcement to see more than what a passerby could see from standing on the adjacent public street and that a passerby would not be able to view into the backyard without being discovered. Finally, citing to the two concurring opinions in *United States v. Jones*, 565 U.S. 400 (2012), defendants assert that the continuous and long term duration of the pole camera surveillance constituted a warrantless search in violation of the Fourth Amendment.

21

The government counters that because the backyard was open to the public, defendants had no expectation of privacy and thus, no Fourth Amendment protection. (Gov't Resp. at 29-33, Docket # 359.) Specifically, the government argues that there was no fence obstructing the view of the front yard. (*Id*.) Additionally, the government argues that there is no expectation of privacy in the backyard because it was a common area shared by the two residences in the duplex, that there were holes on the west side fence of the residence, and that an individual standing on the street could see more of the backyard than the view available to the pole cameras. (*Id*.) Finally, the government argues that *Jones* is not applicable as there was no trespass in this case and that courts have upheld the use of pole cameras of longer duration than was used in this case. (*Id*.)

I begin with the Supreme Court's decision in *United States v. Jones*, 565 U.S. 400 (2012), which clarified the analysis courts are to use when determining the constitutionality of a search conducted by law enforcement. To determine whether an unreasonable search occurred a court must consider: 1) whether a trespass by law enforcement occurred or 2) whether an individual's reasonable expectation of privacy was violated by law enforcement. *Id*. at 408-409. In this case, it is undisputed that both pole cameras were installed on utility poles that were not on defendants' property. Thus, because a physical trespass of defendants' property did not occur, defendants cannot show a Fourth Amendment violation under the *Jones* trespass approach.

Accordingly, the question is whether the use of the pole cameras violated defendants' reasonable expectation of privacy. A defendant objecting to a search bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007). A legitimate expectation of privacy exists when (1) the

22

individual exhibits a subjective expectation of privacy and (2) the individual's expectation of privacy "is one that society is prepared to recognize as reasonable." *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). Courts typically extend the greatest protection to the home, which includes both the residence structure and the home's curtilage, i.e. the area outside the home itself, but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home. *Bleavins v. Bartels*, 422 F.3d 445, 450-51 (7th Cir. 2005).

However, a person does not have a reasonable expectation of privacy in what he knowingly exposes to the public, even in his own home. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). In *Ciraolo*, the Supreme Court stated:

> That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.

476 U.S. at 213. Further, courts have held that police may use technology to enhance or substitute for surveillance what they could lawfully conduct themselves. *See United States v. Knotts*, 460 U.S. 276, 282 (1983) ("Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case.").

Although the parties do not cite, and I have not found, any Seventh Circuit decisions on point, the three other circuits that have considered the use of pole cameras applied the above discussed Fourth Amendment principles to hold that the use of pole cameras to

record what the public can also see does not qualify as a search under the Fourth Amendment. *See e.g.*, *United States v. Houston*, 813 F.3d 282, 285 (6th Cir. 2016); *United States v. Bucci*, 592 F.3d 108, 116-17 (1st Cir. 2009); *United States v. Jackson*, 213 F.3d 1269, 1281 (10th Cir. 2000); *but see United States v. Vargas*, No. 13-CR-6025 (E.D. Wash. Dec. 15, 2014) (Docket # 106, available at http://www.pacer.gov.) (finding that defendant's reasonable expectation of privacy was violated by the government's "constant, covert surveillance" of his partially fenced front yard of his rural home).

*United States v. Houston* is particularly worth discussing as it was decided after *Jones* and confronts some of the same arguments that defendants raise in this case. In *Houston*, law enforcement installed cameras on top of a public utility pole that recorded the defendant's property for ten weeks. 813 F.3d at 285. As in this case, the defendant challenged the video evidence because the camera was installed without a warrant. *Id*. at 286. In finding no Fourth Amendment violation, the court held that there was no expectation of privacy because the video surveillance only captured the same view that a passerby would have on public roads. *Id*. at 288. Further, the court stated that the officers could have stationed agents round-the-clock to monitor the property from the public road and thus their use of technology did not make the surveillance unconstitutional. *Id*. Citing C*alifornia v. Ciraolo*, the *Houston* court noted that the Fourth Amendment does not "'preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" *Id*. (quoting *Ciraolo*, 476 U.S. at 213).

Moreover, the Sixth Circuit held that the length of the surveillance did not render the pole camera use unconstitutional. *Id*. at 289. The court distinguished surveillance via a stationary camera from surveillance via GPS tracking in *Jones*. The Sixth Circuit

24

acknowledged that although five Justices seemed willing to rule that long-term GPS monitoring of a person's vehicle violates a reasonable expectation of privacy, surveillance using a pole camera was "not so comprehensive as to monitor Houston's every move; instead, the camera was stationary and only recorded activities outdoors on the [property.]" *Id*. Additionally, the court in *Houston* stated:

> Because the camera did not track Houston's movements away from the [property], the camera did not do what Justice Sotomayor expressed concern about with respect to GPS tracking: "generate[ ] a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."

*Id*. at 290 (citing *Jones*, 565 U.S. at 414 (Sotomayor, J., concurring)). Lastly, the court explained that "if law enforcement were required to engage in live surveillance without the aid of technology in this type of situation, then the advance of technology would one-sidedly give criminals the upper hand." *Id*.

In this case, the front of the house was not closed off by a fence or shrubbery. The front of the house was on a street with two-way traffic to which the general public has access. The police could have stood on the street outside of the residence and observed who was coming and going in and out of the residence. They even could have used a camera with a long zoom to photograph or videotape those coming in and out of the residence. Plainly stated, the police observed what the mail carrier, package deliverer, solicitor, nosy neighbor, or anyone walking or driving on that street could observe. That they accomplished this with a pole camera rather than in-person surveillance does not alter the Fourth Amendment analysis.

As to the backyard, there was a six-foot fence to the west of the backyard on the property line between the residence and its neighboring property and a four-foot fence to the

east of the backyard. There was also a garage in the backyard that further enclosed the area. There were children's toys and a barbecue grill in the yard indicating the yard's use as an extension of the residence. However, there was also a public street, Fairchild Street, adjacent to the east side fence. Although Fairchild St. is a mere alley that would not have the busy traffic of the two-way street in front of the residence, the police could have positioned themselves on Fairchild Street and observed from the public vantage the comings and goings in the backyard. Activity a person knowingly exposes to the public is not subject to Fourth Amendment protection, and thus, is not constitutionally protected from observation. *See Katz*, 389 U.S. at 351.

Defendants argue that from the high vantage of the pole camera, law enforcement could see more than the passerby. It is true that the camera's high position allowed it to look down into the backyard in a way that passerbys could not. For example, the pole camera photographs are from the view of the top of the heads of the subjects. (*See* Evid. Hearing Exh. K, M, N, and O.) It is also true that the pole camera could zoom. (Evid. Hearing at 9:10:17.) However, while a passerby could not see the top of the heads of people in the backyard or items such as the grill obstructed by the four-foot fence, a passerby would certainly be able to see people and the activity in the backyard. (*See* Evid. Hearing, Exh. D and F.) Indeed, Detective Langendorf testified that from standing on Fairchild Street he could see the entirety of the backyard. (Evid. Hearing at 9:32:38.) Thus, this is not like *United States v. Cuevas-Sanchez*, 821 F.2d 248 (5th Cir. 1987), cited by defendants, where agents used a camera to observe activity that would otherwise be hidden by a fence. As discussed above, the Fourth Amendment does not preclude law enforcement from making

observations from a public vantage. Nor does it preclude law enforcement from using technology to enhance or substitute for surveillance they could lawfully conduct in-person.

Defendants' most compelling argument concerns the degree and duration of the pole camera surveillance. The pole cameras surveilled continuously for fifty-nine days (August 8, 2016 to October 5, 2016) in the front yard and continuously for eighty-three days (July 15, 2016 to October 5, 2016) in the backyard. Defendants argue that the aggregate of information gathered by the police from the pole cameras is different than what a casual passerby could observe. Undeniably, even though the police could have done the same surveillance with old-fashion techniques if they were willing to expend the resources, there is something that feels viscerally intrusive and Orwellian about law enforcement's continuous videotaping of even the exterior of a private residence for as long as eighty-three days as occurred here. *See United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) ("This type of surveillance provokes an immediate negative visceral reaction: indiscriminate video surveillance raises the spectre of the Orwellian state."). But as the Sixth Circuit noted in *Houston*, unlike the use of the *GPS*, the use of the pole camera was not so comprehensive as to monitor defendants' every move. A stationary video camera only observes and records what is in its view. While the pole cameras recorded activities within the surveilled area, they did not and could not record defendants' activities outside of the camera's limited field of view.

More to the point, defendants' argument regarding the duration of the pole camera surveillance rests on dicta from the two concurring opinions in *Jones*. In his concurrence, Justice Alito (joined by Justices Ginsburg, Breyer, and Kagan) concludes that while "relatively short-term monitoring of a person's movements on public streets accords with

expectations of privacy that our society has recognized as reasonable, the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." 565 U.S. at 430 (Alito, J., concurring). In her concurrence, Justice Sotomayor explicitly agreed with that conclusion, *id*. at 416, and even the majority left open the possibility that four weeks of continuous surveillance achieved through electronic means "is an unconstitutional invasion of privacy," *id*. at 412. Thus, defendants are correct that at least as of 2012, it appears that a majority of the Court was prepared to hold that four weeks of warrantless GPS tracking violated the Fourth Amendment. But as one district judge succinctly put it in discussing this very issue, "this court cannot base its decision on what effectively amounts to a guess regarding how the Supreme Court might decide an issue of first impression." *United States v. Mazzara*, No. 16-CR-576, 2017 WL 4862793, *11 (S.D.N.Y Oct. 27, 2017). Additionally, "not only has the composition of the Supreme Court changed since 2012, so has the nature and ubiquity of technology in our everyday lives." *Id*. Further, "the same technological advances that have made possible nontrespassory surveillance techniques will also affect the *Katz* test by shaping the evolution of societal expectations." *Id*. (citing *Jones*, 565 U.S. at 414 Alito, J., concurring)).

For all these reasons, based on current precedent, activity in the backyard that was exposed to the public was not protected by the Fourth Amendment. Law enforcement's use of the pole camera to observe what the public could see in the backyard and what they themselves could have observed with traditional surveillance tools did not constitute a search for which a warrant was required. I, therefore, recommend that defendants' motions to suppress evidence of the pole cameras be denied.

28

3.      *Motion to Suppress Evidence from Jose Perez's Residence*

Defendant Jose Perez moves to suppress evidence obtained from the search of his 38th Avenue residence pursuant to a search warrant. He argues that the affidavit supporting the warrant lacked probable cause to connect the residence to any illegal activity. The government does not contest this motion and agrees to not use evidence from this search in its case in chief. Accordingly, I recommend that Perez's motion to suppress be granted.

4.      *Motion to Suppress Evidence from Defendant Dumas' Cell Phones*

Trevian Dumas moves to suppress the search and seizure of his cell phones pursuant to a state court search warrant. He argues that the affidavit in support of the search warrant was insufficient to establish probable cause. The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

To determine whether to suppress evidence obtained pursuant to an allegedly defective search warrant, the court employs a sequential two-step test. *See United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002). First, the court determines whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. *United States v. Lloyd*, 71 F.3d 1256, 1262 (7th Cir. 1995). Second, if the court concludes that the warrant was not supported by probable cause, it asks whether the warrant is nonetheless saved by the good faith exception to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 920-24 (1984).

29

An affidavit establishes probable cause when it alleges facts sufficient to induce a reasonably prudent person to believe that a search will uncover evidence of a crime. *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003). The Supreme Court has explained that:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). Though the affiant need not state each and every detail of the suspected crime, mere conclusory statements are insufficient. *See United States v. Reddrick*, 90 F.3d 1276, 1280 (7th Cir. 1996). The affidavit must contain sufficient evidence to enable the magistrate to exercise independent judgment rather than simply ratifying the conclusions of others. *Gates*, 462 U.S. at 239.

A reviewing court must read the affidavit in a realistic and common sense manner, determining whether it alleges "specific facts and circumstances" that would permit the issuing magistrate "to reasonably conclude that the evidence sought to be seized was associated with the crime alleged and located in the place indicated." *Koerth*, 312 F.3d at 866-67 (citing *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)). A court should give a magistrate's determination of probable cause considerable weight and resolve doubtful cases in favor of upholding the warrant. *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000).

A court's duty in reviewing a judicial officer's previous probable cause finding is simply to ensure that the judicial officer had a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238-39. When an affidavit is the "only evidence presented to the warrant-issuing magistrate, 'the warrant must stand or fall solely on the contents of

30

the affidavit.'" *Koerth*, 312 F.3d at 866 (quoting *United States v. Roth,* 391 F.2d 507, 509 (7th Cir. 1967)).

If the court finds the warrant deficient, it must then proceed to the second step of the analysis to determine whether the executing police officer could "have reasonably believed that the facts set forth in the affidavit were sufficient to support a magistrate's finding of probable cause." *Koerth*, 312 F.3d at 866 (citing *Leon*, 468 U.S. at 920-24). The government bears the burden of demonstrating by a preponderance of the evidence that the police relied in "good faith" on the magistrate's decision to issue the warrant. *Koerth*, 312 F.3d at 868. However, an officer's decision to seek a warrant is *prima facie* evidence that he acted in good faith. *Peck*, 317 F.3d at 757; *Koerth*, 312 F.3d at 868; *see also Leon*, 468 U.S. at 924 ("When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time.").

To rebut this presumption, the defendant may show that: (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) the magistrate wholly abandoned his neutral, detached judicial role and simply rubber-stamped the warrant application; or (3) the warrant was based on an affidavit so lacking in indicia of probable cause that no reasonable officer could have relied on it. *See Leon*, 468 U.S. at 923; *Peck*, 317 F.3d at 757; *Koerth*, 312 F.3d at 868.

Nevertheless, the evidence will be admitted unless: "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his

31

affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Koerth*, 312 F.3d at 869.

In this case, on March 30, 2016, a surveillance camera at Welcome Mart in Racine, Wisconsin recorded Dumas stealing snacks. (Gov't Resp. at 34, Docket # 359.) One week later, on April 8, 2016, after being identified from photos from the surveillance video, Dumas was arrested. (*Id.*) At the time of his arrest, he was found with two cell phones. On April 11, 2016, Dumas was charged with retail theft and disorderly conduct in Racine County Circuit Court. (*Id.*) On April 14, 2016, Racine investigator, Jessie Lewis, swore to the facts of an affidavit seeking a warrant to download the information on Dumas' cell phones. (*Id.*) Relevant portions of the affidavit read as follows.

> 6. Your affiant knows that on 4/08/2016, . . . [Officer Nicholas Contreras] arrested Trevian Dumas. Your affiant was made aware that Trevian Dumas had the two cellular phones listed in this affidavit during his arrest.
>
> 8. That your affiant knows from his training and experience that cellular phones are often used either before, during, or after the commission of crime(s).
>
> 9. That your affiant knows from his training and experience that cellular phones have the potential to show the location of where the user(s) (suspect) of the device were previously located.
>
> 11. Your affiant knows from his training and experience that cellular telephones are capable of storing text messages (content), e-mails, contact information, incoming and outgoing call logs, voicemails, applications, internet search history, photographs, videos, navigation history, location history and are often used in the commission of crimes.

(Docket # 314-1.)

I agree that the affidavit fails to demonstrate probable cause that evidence of retail theft and disorderly conduct would be found on the two cell phones. The affidavit establishes that photos from the surveillance video were used to identify Dumas. It also

establishes that Dumas was arrested and that when he was arrested he was in possession of the two cell phones. But the bare-boned affidavit woefully fails to connect the two cell phones with the commission of the retail theft and disorderly conduct. Recall that Dumas was arrested one week after the theft. Nothing in the affidavit suggests that he was in possession of the cell phones during the commission of the retail theft and disorderly conduct, or that he used the cell phones during the commission of the offenses. There must be some nexus between the items to be searched and the commission of the crime. A mere boilerplate recitation about the use and features of cell phones is not enough. Otherwise being arrested for anything, including minor violations of the law, would always provide probable cause to search one's cell phone regardless of any connection between the violation arrested for and the cell phone. The law requires more.

The government argues that the cell phones would likely contain evidence of Dumas' involvement in the retail theft by placing his phone at the crime scene. Again, the affidavit does not contain any information for the judge to conclude that Dumas was in possession of the cell phones or used the cell phones during the commission of the crime some two weeks prior to the swearing of the affidavit. As an aside, Dumas' location during the commission of the retail theft was known. His location was recorded by the surveillance camera at the store. More importantly, although the probable cause bar is not high, it is more than an open-ended possibility that a search will yield evidence of the crime under investigation. Probable cause requires specific facts to permit the judge to reasonably conclude that the evidence sought to be seized is associated with the crime alleged and located in the place indicated. This affidavit fails to meet that standard. I recommend that the court find that the affidavit lacks probable cause to search Dumas' cell phones.

33

The government argues that even if the court determines that the warrant was not supported by probable cause, evidence obtained during the search need not be suppressed because of the *Leon* good faith exception. I disagree. This is the rare affidavit that cannot be saved by the *Leon* good faith exception. Here, the affidavit is so plainly deficient that any reasonably well-trained officer "'would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Koerth*, 312 F.3d at 869. What is the connection between the cell phones and the retail theft and disorderly conduct? The generic boilerplate statement that "cellular phones are often used either before, during, or after the commission of crime(s)" is not enough in itself, where nothing else in the affidavit connects the cell phones to the crimes.

Equally, the generic boilerplate statement that "cellular phones have the potential to show the location of where the user(s) (suspect) of the device were previously located" is insufficient where nothing else connects the cell phones to the offenses. Neither statement read alone or together connects the cell phones to the specific offenses alleged in the affidavit. With the ubiquity of cell phones, both of these statements can be cut and pasted into any affidavit. A reasonably well-trained officer would have known that specific facts connecting the items to be searched and the alleged offense are required for probable cause and in the absence of specific facts, he should not have applied for the warrant. Stated differently, the nexus between the cell phones and the alleged offenses are nonexistent such that a reasonably well trained officer would have known that the warrant was not supported by probable cause despite the judge's authorization.

For this reason, I conclude that this affidavit is so plainly deficient as to mock the probable cause standard and, more fundamentally, the Fourth Amendment. I recommend

that the court find that the *Leon* good faith exception does not apply in this case and the evidence seized from the two cell phones be suppressed.

5.    *Juan Guajardo's Motion to Sever*

Juan Guajardo moves to sever his trial from the other defendants charged in the Indictment pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Guajardo argues that a joint trial will prejudice his defense.

To repeat, the indictment charges twenty-four individuals with seventeen offenses. (Docket # 126.) Count One, the only count Guajardo is charged with, alleges a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1). (*Id*. at 2.) All of the defendants are charged with Count One. Guajardo asserts that while the indictment alleges a conspiracy spanning longer than seven years, he is not a long term member of the conspiracy as he was not mentioned by law enforcement until late September 2016. (Guajardo's Mot. to Sever at 2, Docket # 327.) Guajardo further argues that unlike the other defendants, who are related by either family, gang, or business ties, he stands alone. (*Id*.) Guajardo also asserts that the massive amount of evidence and the gross disparity of the weight of the evidence prejudices him and thus denies him a right to a fair trial. (Guajardo Rep. Br. at 2, Docket # 381.)

The government responds that there will be witness and evidence overlap resulting in a waste of judicial and prosecutorial resources if severance is granted. (Gov't Resp. at 41, Docket # 359.) Additionally, the government asserts that as a member of the conspiracy, Guajardo is "accountable for the drug-trafficking and related acts of his co-conspirators that were made in furtherance of the conspiracy." (*Id*. at 41-42.) Furthermore, citing *United States v. Briscoe*, 896 F.2d 1476, 1517 (7th Cir. 1990), the government argues that "[o]ur criminal

35

justice system relies upon the notion that a jury is able to sort evidence properly and follow instructions." (*Id.* at 41.)

Guajardo does not dispute that he and his co-defendants are properly joined under Fed. R. Crim. P. 8. Rather, he argues for severance under Fed. R. Crim. P. 14(a) which authorizes a district court to order separate trials on individual counts "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses" for a single trial. *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998) (quoting Fed. R. Crim. P. 14(a)). In particular, joinder of offenses in a single trial reduces the expenditure of judicial and prosecutorial time and reduces the burdens on witnesses from testifying at multiple trials. *See United States v. Buljubasic*, 808 F.2d 1260, 1263 (7th Cir. 1987). Therefore, the risk of prejudice arising from a joint trial is generally outweighed by the economies of a single trial. *United States v. Carrillo*, 435 F.3d 767, 778 (7th Cir. 2006).

It is defendants' burden to demonstrate a strong showing of prejudice. *United States v. Moya–Gomez*, 860 F.2d 706, 767–68 (7th Cir. 1988). A mere showing of some prejudice will not warrant severance. *United States v. Madison*, 689 F.2d 1300, 1305 (7th Cir. 1982). Rather, defendants must show that they are unable to obtain a fair trial without severance, not merely that their chances of acquittal would be higher at a separate trial. *Alexander*, 135 F.3d at 477; *United States v. Thornton*, 197 F.3d 241, 255 (7th Cir. 1999). Thus, a motion to sever should be denied unless there appears "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Guajardo makes several arguments for severance. First, he argues that severance is appropriate because his anticipated defense, while not antagonistic or mutually exclusive,

could be lost or become muddled in a joint trial. He points out that unlike the other defendants, he is not related by family, gang ties, or business relations which provides him a unique defense. This is not a basis for a severance. Defendants must show that they are unable to obtain a fair trial without severance, not merely that they would have a better chance of acquittal at a separate trial. *Alexander*, 135 F.3d at 477.

Guajardo also argues that severance is warranted by evidentiary spillover and disparity of evidence. Guajardo asserts that the evidence "'gets into the weeds' detailing transactions involving others than Mr. Guajardo." (Guajardo's Rep. at 1, Docket # 381.) He also argues that there is a gross disparity in the amount and weight of the evidence as he is only being charged with one of the seventeen counts. (*Id.* at 2.) While the risk of prejudice is heightened when there are "markedly different degrees of culpability," limiting instructions are often sufficient to cure any risk of prejudice. *Zafiro*, 506 U.S. at 539. Moreover, courts presume that a jury will capably sort through the evidence and will follow limiting instructions from the court to consider each count and each defendant separately. *Thornton*, 197 F.3d at 256. Guajardo has not shown that jury instructions would be inadequate to prevent confusion nor has he shown that the jury would have difficulty following an instruction to consider the evidence as to each defendant separately.

Finally, conservation of resources also weighs against severance. Because Guajardo is charged in the conspiracy count, severing his case for trial would require many of the same witnesses to testify twice. For these reasons, Guajardo has failed to show that a joint trial would result in serious prejudice against him. Therefore, Guajardo's motion to sever is denied.

37

6.      *Motions to Disclose Confidential Informants*

Defendants Juan Guajardo and Bradley Sorenson move for an order directing the government to immediately disclose the identity of certain government informants. The government opposes the defendants' request for immediate disclosure citing concerns related to the safety of the informants and their families.

It is well-established that as a general rule, the government enjoys a limited privilege of withholding the identity of an informant. *See Roviaro v. United States*, 353 U.S. 53, 59-60 (1957); *United States v. Bender*, 5 F.3d 267, 269 (7th Cir. 1993). This privilege encourages citizens to perform their obligation to communicate their knowledge of the commission of crimes to law enforcement officials by preserving the informant's anonymity. *United States v. Jefferson*, 252 F.3d 937, 940 (7th Cir. 2001). The government is granted this limited privilege as a right, and need not make a threshold showing of likely reprisal or retaliation against the informant in order to assert the privilege. *United States v. Valles*, 41 F.3d 355, 358 (7th Cir. 1994).

Although automatic, the government's privilege is not absolute. "Where the disclosure of an informer's identity . . . is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60-61. The defendant bears the burden in the face of an assumption that the privilege should apply. *Valles*, 41 F.3d at 358. "The confidential informant privilege will not yield to permit a mere fishing expedition, nor upon bare speculation that the information may possibly prove useful." *Id.* (internal quotation and citation omitted).

Disclosure of a confidential informant's identity "must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible

defenses, the possible significance of the informer's testimony, and other relevant factors." *Roviaro*, 353 U.S. at 62. Factors to be considered are whether the informant is a transactional witness and whether the informant's testimony is relevant and could assist the defendant. *Bender*, 5 F.3d at 270. "Informants who played major roles in the criminal occurrences will of course offer more significant testimony than those whose participation was peripheral; a showing that a potential defense may depend on the informant's involvement also weighs in favor of disclosure." *Valles*, 41 F.3d at 358.

The nature of the confidential informant's role is an important factor to consider when determining whether that informant's identity should be disclosed. *United States v. Harris*, 531 F.3d 507, 515 (7th Cir. 2008). When a confidential informant is a "mere tipster," disclosure is not required. *Id*. A "tipster," is "someone whose only role was to provide the police with the relevant information that served as the foundation" for the investigation. *United States v. Wilburn*, 581 F.3d 618, 623 (7th Cir. 2009) (citing *Harris*, 531 F.3d at 515).

On the other hand, a "transactional witness" is one "who participated in the crime charged against a defendant or witnessed the event in question." *Id*. In *Roviaro*, the Court required disclosure of a confidential informant who was the sole participant, other than the defendant, in the transaction charged against the defendant. *Roviaro*, 353 U.S. at 64. The Court found the informant's testimony "highly relevant" because he "had helped to set up the criminal occurrence and had played a prominent part in it." *Id*. Ultimately, to determine whether the government is required to disclose the identity of an informant, the court must balance the public interest in obtaining information necessary to apprehend those who have committed crimes against the defendant's interest in a fair trial. *United States v. Andrus*, 775 F.2d 825, 841 (7th Cir. 1985).

39

In this case, Guajardo seeks the disclosure of the identities of CS-2 and CS-6. (Guajardo Mot. Disc., Docket # 326.) CS-2 is alleged to have witnessed a defendant in this case place controlled substances and money inside a safe located in Guajardo's residence four times in 2016. Although unclear, CS-2 may also implicate Guajardo in a controlled buy of crystal methamphetamine. CS-6 alleged that she/he was present at Guajardo's residence when Guajardo displayed controlled substances, encouraged their consumption, and discussed their procurement. Guajardo argues that he needs the prompt disclosure of the identities of these two informants to investigate his defense and prepare for trial.

Sorenson also moves for the disclosure of the identity of CS-2. (Sorenson Mot. for Disc., Docket # 331.) CS-2 alleges that Sorenson fronted quantities of powder cocaine and marijuana from Tirado Jr., which CS-2 claims Sorenson would then sell to customers at a bar. (*Id* at 1-2.) Additionally, CS-2 alleges that Sorenson would sell a minimum average of half an ounce of powder cocaine each week to wealthy individuals who frequented the bar. (*Id*. at 2.) Finally, CS-2 alleged that Sorenson told CS-2 that Tirado Jr. and Marco Munoz would ship packages of controlled substances to Sorenson's residence. (*Id*). Based on these allegations, Sorenson argues that he needs the prompt disclosure to the identity of CS-2 to investigate his defense and prepare for trial.

The government does not contest that CS-2 and CS-6 are transactional witnesses. However, the government responds it is withholding the identities of the confidential informants out of fear for their safety. (Gov't Resp. at 44-46, Docket # 359.) The government submits that this case involves drug trafficking by the Maniac Latin Disciples, an off-set of the Gangster Disciples and is connected to a number of violent acts in this district and in Illinois, including retaliation against confidential sources. (*Id*. at 44.)

40

Additionally, the government asserts that retaliation against suspected informants has occurred since the filing of charges in this case. Specifically the government states that a co-defendant's relative posted a list of suspected confidential informants to social media after the takedown in this case. (*Id.*) Additionally, in early August, a suspected informant was shot at and physically assaulted by a relative of a co-defendant and fellow MLD member. (*Id.*)

On this record, I find that protecting the safety of confidential informants is a legitimate reason for not immediately disclosing their identities. *See Bender*, 5 F.3d at 270; *see also United States v. Dorsey*, No. 06-CR-99, 2006 WL 2192040, *3 (E.D. Wis. Aug. 1, 2006). Additionally, in this district, disclosing the identities of confidential informants thirty days before trial is common practice. *See United States v. Bond*, No. 10-CR-117, 2010 WL 6749142 (E.D. Wis. Dec. 6, 2010); *United States v. Mathis*, No. 09-CR-254, 2010 WL 1507881 (E.D. Wis. Apr. 14, 2010). Thus, I find that the disclosure of the confidential informants' identities forty-five days prior to trial, as proposed by the government, is sufficient time to allow Guajardo and Sorenson to adequately prepare and exceeds the common practice of thirty days prior to trial, as noted above. Both defendants have already been provided with the informants' statements, save for their identities. In sum, Guajardo and Sorenson have failed to demonstrate that they possesses a genuine need for immediate informant disclosure that outweighs the public's interest in the safety of the informants. *See Bender*, 5 F.3d at 270. Accordingly, defendants' motions are denied. The government shall disclose the identities of any confidential informant it intends to call in its case in chief at trial not less than forty-five days prior to the commencement of trial.

*7.*      *Brian Johnson's Motion for Bill of Particulars (Count One)*

Defendant Brian Johnson (Docket # 318) moves for a bill of particulars related to Count One of the indictment which charges Johnson and others with a conspiracy to possess with intent to distribute and to distribute controlled substances. Johnson requests that the government provide him with: (1) all names known to the government whom alleges Johnson participated in the conspiracy; (2) specific dates that the government alleges Johnson became a member of the conspiracy; (3) specific agreements and crimes of the conspiracy Johnson committed; (4) specific dates that Johnson allegedly traveled to obtain controlled substances; (5) specific acts which Johnson allegedly served as an "enforcer"; (6) specific acts and times when Johnson stored drugs for Tirado Jr.; (7) specific electronic devices the government intends to use against Johnson at trial; and (8) specific Title III intercepts and conversations the government intends to use against Johnson at trial.

Federal Rule of Criminal Procedure 7(f) authorizes the court to order the filing of a bill of particulars to fill in facts in the indictment so that the defendant can prepare an adequate defense. *See* Fed. R. Crim. P. 7(f); *United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981). A bill of particulars is "a more specific expression of the activities the defendant is accused of having engaged in which are illegal." *United States v. Canino*, 949 F.2d 928, 949 (7th Cir. 1991). A bill of particulars is required only where the charges in the indictment are so general that they do not advise the defendant of the specific act of which he is accused. *See id.*

The test for determining whether a bill of particulars should be granted is similar to the test for determining the general sufficiency of the indictment, namely, "whether the indictment sets forth the elements of the offense charged and sufficiently apprises the

42

defendant of the charges to enable him to prepare for trial." *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003) (quoting *Kendall*, 665 F.2d at 134); *Canino*, 949 F.2d at 949. An indictment which includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test. *Kendall*, 665 F.2d at 134. A bill of particulars is not required when a defendant can obtain the information necessary for his or her defense through "some other satisfactory form." *Fassnacht*, 332 F.3d at 447, n.2 (quoting *Canino*, 949 F.2d at 949). The Seventh Circuit has held that the government's "open file" policy is an adequate "satisfactory form" of information retrieval, making a bill of particulars unnecessary. *Canino*, 949 F.2d at 949.

In this case, Johnson does not argue that Count One does not track the statutory language or elements. It does. Additionally, he does not argue that the government has not complied with its open file policy. Quite the contrary, he complains that the discovery is so voluminous, consisting of thousands of pages and spanning over seven years, that he cannot discern the specificity of the time and place in which it is alleged that he engaged in a conspiracy. Although Johnson's complaint about the voluminous discovery is well-taken, a defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case. *Id.* at 135 (internal quotation and citation omitted). Nor does a defendant have a right to know the details of how the government will prove its case. *Id.* ("The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."). Consequently, the indictment and discovery materials provide Johnson with sufficient information to apprise

him of the charge and enable him to prepare his defense. Johnson's motion for bill of particulars is therefore denied.

8.      *Tirado Sr.'s Motion to Dismiss Count Two or for Bill of Particulars*

Tirado Sr. moves to dismiss Count Two, or in the alternative for a bill of particulars. Specifically, Tirado Sr. asserts that Count Two contains four defects that warrant dismissal. Tirado Sr. states that Count Two: (1) "does not identify any particular financial transaction(s) as constituting money laundering"; (2) defectively includes "distribution of controlled substances" instead of "dealing in a controlled substance"; (3) does not include the $10,000 monetary threshold element as specified in § 1957; and (4) includes the phrase "commit offenses against the United States," language that is not included in the statute.

The government argues that because Count Two is "essentially a verbatim recitation" of 18 U.S.C. § 1956(a)(1)(B)(i), the indictment is sufficient. (Gov't Resp. at 3, Docket # 443.) Additionally, the government asserts that because Count Two is charging Tirado Sr. with *conspiracy* to launder money in violation of 18 U.S.C. § 1956(h), it is not required to list the substantive elements. (*Id.* at 4.) Further, the government argues that the indictment's use of the term "distribution of controlled substances" as the specified unlawful activity instead of the phrase "dealing in a controlled substance," as defined in § 1961(1), adequately notifies the defendant about the nature of the charge against him. (*Id.* at 6.) Lastly, the government states that the phrase "offenses against the United States" merely introduces § 1956 and § 1957 and does not warrant dismissal. (*Id.* at 5.)

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it: (1) states the elements of the offense charged; (2) fairly informs the defendant

44

of the nature of the charge so that he may prepare a defense; and (3) enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). Once the elements of the crime have been specified, an indictment need only provide enough factual information to enable a defendant to identify the conduct on which the government intends to base its case. *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003). "The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Id.* (internal citation omitted). Simply tracking the language of the charging statute will generally suffice. *White*, 610 F.3d at 958-59.

In this case, Count Two of the indictment alleges that Tirado Sr. and others:

> [D]id knowingly combine, conspire, and agree with each other and with other persons known and unknown to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956 and 1957, namely: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, distribution of controlled substances, knowing that the transactions were designed . . . to conceal . . . and control the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i). In violation of Title 18, United States Code, Section 1956(h).

(Indictment at 4, Docket # 126.)

Title 18 U.S.C. § 1956(a)(1)(B)(i) reads as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . .

45

18 U.S.C. § 1956(a)(1)(B)(i). Finally, Section 1956(h) makes it a crime to "conspire to commit" any offense under section § 1956 or § 1957.

Tirado Sr. argues that the indictment in this case suffers similar defects to the indictment in *United States v. Knowles*, 2 F. Supp. 2d 1135 (E.D. Wis. 1998). In *Knowles*, the indictment read as follows:

> The Grand Jury Charges: From on or about January 1, 1996, and continuing to on or about October 3, 1997, within the State and Eastern District of Wisconsin, and elsewhere, John Vincent Knowles, Jr., the defendant herein, did knowingly conspire with other persons both known and unknown, to commit money laundering with the intent to promote the carrying on of drug trafficking. All in violation of Title 18, United States Code, §§ 1956(a)(1)(A) and (h) and 2.

*Id*. at 1138. The court in *Knowles* held that the indictment "[did] not unambiguously set out the elements of the offense. . . ." Section 1956(a)(1)(A) reads as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced. . . .

§ 1956(a)(1)(A).

The court found two fatal flaws in the indictment. First, the court noted that the indictment did not use the specific definition of "financial transaction" found in 18 U.S.C. § 1956(4), but merely alleged money laundering, "which, as it is colloquially understood, may be as broad as the statute itself. . . ." *Knowles*, 2 F. Supp. 2d at 1139. Further, the court noted that the term "drug trafficking," as used in the indictment, was not "squarely within" any category of unlawful activities listed in § 1956(c)(7). *Id*. Accordingly, the court stated that the indictment's ambiguity prevented the defendant's ability to prepare a defense and did not afford him double jeopardy protection. *Id*.

46

Unlike in *Knowles*, the indictment in this case tracks the statutory language of §
1956(a)(1)(B)(i). It avoids the use of the broad colloquial term "money laundering." It
instead incorporates the more specific definition of "financial transaction" found in §
1956(c)(4). It also sets out the elements of § 1956(h). To convict a defendant of conspiracy to
commit money laundering, the government must show the defendant was involved with one
other person to launder money and that the defendant knew the proceeds used to further the
scheme were derived from an illegal activity. *United States v. McBride*, 724 F.3d 754, 757 (7th
Cir. 2013). Here, the indictment specifically alleges that the defendants conspired to conduct
or attempt to conduct financial transactions involving the proceeds of drug distribution
knowing that the transactions were designed to conceal the proceeds of drug distribution.
Thus, unlike the indictment in *Knowles,* the indictment in this case "sufficiently apprises
[Tirado Sr.] of the nature of the charges against him, so that he may prepare a defense."
*United States v. Smith*, 230 F.3d 300, 306 (7th Cir. 2000).

Also, unlike in *Knowles*, the indictment identifies a "specified unlawful activity"
covered by 18 U.S.C. § 1956 (c)(7) and 18 U.S. C. § 1961. Although 18 U.S.C. § 1961 lists
"dealing in a controlled substance" instead of "distribution of controlled substances," I do
not find that the word choice renders the indictment invalid. *See id*. at 306. ("Indictments
are reviewed on a practical basis and in their entirety, rather than 'in a hyper-technical
manner.'") (internal citation omitted). The term "distribution of controlled substances"
sufficiently apprises Tirado Sr. of the unlawful activity alleged and he does not make the
argument that there is any meaningful difference between "distribution of controlled
substances" and "dealing in a controlled substance." Accordingly, because the indictment in

this case does not suffer the defects presented in *Knowles*, dismissal of Count Two pursuant to *Knowles* is not warranted.

Beyond *Knowles*, Tirado Sr. argues that the indictment contains two additional defects. First, Tirado Sr. points out that the indictment contains the phrase "to commit offenses against the United States," which is language from 18 U.S.C. § 371, not § 1956(h). I agree that "offenses against the United States" is not an element of § 1956(h). However unnecessary, this language does not obscure the charge against Tirado Sr. such that dismissal is warranted.

Additionally, Tirado Sr. argues that Count Two fails because it alleges conspiracy to commit money laundering in violation of § 1956 and § 1957 without any reference to the §10,000 element of § 1957. Recall, however, that this count charges a conspiracy offense. It is not required that a conspiracy count allege all of the elements of the substantive offense that is the object of the conspiracy. *United States v. Kahn*, 381 F.2d 824, 829 (7th Cir. 1967) (citing *Wong Tai v. United States*, 273 U.S. 77, 81 (1927)). It is sufficient that a conspiracy charge clearly identify the offense that the defendant conspired to violate. Here, unlike the indictment in *Knowles,* Count Two uses the specific definition of financial transaction rather than the colloquial and broad term "money laundering," sets forth the elements of conspiracy under § 1956(h), and identifies an unlawful activity covered by the statute. Thus, despite the omission of the $10,000 element of the substantive offense in § 1957, Count Two sufficiently apprises Tirado Sr. that he is charged with conspiracy to commit money laundering in violation of § 1956 and § 1957.

Alternatively, Tirado, Sr. moves for a bill of particulars "identifying which specific transactions, including their nature and participants, are alleged to constitute violations of §

48

1956(h)." (Mot. For Bill of Particulars at 6, Docket # 323.) The government responds that it has maintained its open file policy and that Tirado Sr. "has more than enough information about the government's case to prepare for trial." (Gov't Resp. at 51, Docket # 359.) Tirado Sr. acknowledges the Seventh Circuit's view that the "open file" policy is an adequate "satisfactory form" of information retrieval, making a bill of particulars unnecessary. *United States v. Canino*, 949 F.2d 928, 949 (7th Cir.1991). He, however, argues that the voluminous discovery makes finding the relevant transactions as difficult as finding "needles within a haystack." (Docket # 323 at 6.)

In this regard, Tirado Sr.'s reasons for asking for the bill of particulars is similar to his co-defendant Johnson's reason for requesting a bill of particulars as to Count One and is also well-taken. Nevertheless, as discussed in Johnson's motion for bill of particulars, Tirado Sr. is not entitled to know all the evidence the government intends to produce nor how the government will prove its case. A defendant is only entitled to know the offense with which he is charged. Because the indictment and discovery provide Tirado Sr. with sufficient information to apprise him of the charge and prepare for trial, Tirado Sr.'s motion for a bill of particulars is also denied.

9.    *Motion for Notice of Certain Evidence*

Finally, Angel Reyes moves for an order requiring the government to give immediate notice of any uncharged misconduct evidence under Fed. R. Crim. 404(b) and a written summary of the nature of any expert witnesses' opinions, the bases and reasons for these opinions, and the witnesses' qualifications under Fed. R. Crim. P. 16(a)(1)(G).

Reyes' motion for immediate disclosure of any uncharged misconduct under Fed. R. Evid. 404(b)(2)(A) is improper. *See, e.g., United States v. Mathis*, No. 09-CR-254, 2010 WL

49

1507881, *1 (E.D. Wis. Apr. 14, 2010) ("As this court has repeatedly said in the past, 'motions' for disclosure under Rule 404(b) are improper."); *United States v. Kaffo*, No. 09-CR-256, 2009 WL 5197826, *2 (E.D. Wis. Dec. 22, 2009) ("[N]o motion is required."). Rule 404(b) requires only that the defendant request the information, and the government has construed Reyes's motion as such a request and states it will comply with its obligation. (*See* Docket # 359 at 52.) Moreover even if proper, Reyes has not provided any justification or authority for immediate disclosure. Reyes's motion for immediate disclosure of Fed. R. Crim. 404 (b) evidence, is therefore, denied.

Regarding Reyes' motion for early disclosure of the Rule 16 materials, the government is correct that under Crim. L.R. 16(a)(4), when the government is following the open file policy, the Rule 16 materials must be disclosed not less than fifteen days before trial. This rule generally works. However, it is not unreasonable in complex cases with multiple defendants to require the government to provide this information sooner than fifteen days prior to trial. This not only allows the defendants to prepare, but also allows the parties and the court to efficiently address any *motions in limine* related to expert disclosures. Accordingly, Reyes' motion is granted. The government is ordered to disclose expert witness information under Fed. R. Crim. P. 16(a)(1)(G) no less than 30 days prior to trial.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendants' motions to suppress the Title III order (Docket # 315, 321, 328, 330, 333, 337, 338, 343, and 376 be **DENIED**;

**IT IS FURTHER RECOMMENDED** that defendants' Motion to Suppress Pole Camera Footage (Docket # 319, 322, 329, 334, 336, 339, 344) be **DENIED**;

**IT IS FURTHER RECOMMENDED** that defendant Jose Perez's Motion to Suppress Evidence Seized from His Home (Docket # 316) be **GRANTED**;

**IT IS FURTHER RECOMMENDED** that Dumas' Motion to Suppress (Docket # 314) be **GRANTED**;

**FURTHERMORE**, defendant Guajardo's Motion to Sever (Docket # 327) is **DENIED**;

**FURTHERMORE**, defendants' Motions to Disclose Confidential Informants (Docket # 326, 331) is **DENIED**;

**FURTHERMORE**, Brian Johnson's Motion for Bill of Particulars (Docket # 318) is **DENIED**;

**IT IS FURTHER RECOMMENDED** that Tirado Sr.'s Motion to Dismiss Count Two (Docket # 422) be **DENIED**;

**FURTHERMORE**, Tirado Sr.'s Motion for Bill of Particulars (Docket # 323) is **DENIED**;

**FURTHERMORE**, defendants' Motion for Certain Evidence (Docket # 340) is **DENIED** in part and **GRANTED** in part. Specifically, Reyes' motion for immediate disclosure of 404(b) evidence is denied. Reyes' motion for early disclosure of Rule 16 materials is granted;

**FURTHERMORE**, Cartajena's pretrial motions (Docket # 436, 438, 441) are withdrawn.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part

thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 26th day of January, 2018.

BY THE COURT

_s/ Nancy Joseph_
NANCY JOSEPH
United States Magistrate Judge